## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

|  |  |  |
|---|---|---|
| ALLEN PLYLER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **CIVIL ACTION FILE** |
| | ) | |
| WHIRLPOOL CORPORATION, | ) | **NO. 08-CV-6637** |
| | ) | |
| Defendant. | ) | |
| | ) | |

## DEFENDANT'S BRIEF IN OPPOSITION TO PLAINTIFF'S
## MOTION FOR NEW TRIAL

COMES NOW, Whirlpool Corporation ("Whirlpool"), Defendant in this case, and files its brief in opposition to Plaintiff's Motion for New Trial.

### *STATEMENT OF FACTS*

On March 15, 2012, after a full trial of this case, the jury returned a verdict for Whirlpool. (Docket No. 155) The Court entered judgment on the verdict that same day. (Docket No. 156) Twenty-eight (28) days later on April 12, 2012, Plaintiff filed a Motion for New Trial. (Docket No. 157) In support of his motion, Plaintiff asserts three reasons for a new trial: (1) That the verdict was against the manifest weight of the evidence; (2) That the court improperly restricted the Plaintiff from offering his own personal opinions about the fire's cause and origin and burn patterns in his home; and (3) That Plaintiff should not have been cross-examined about the effect of his divorce on his mental health. See Plaintiff's Motion for New Trial.

For the reasons, set out below, the Plaintiff's Motion should be denied.

334135v.1

### *ARGUMENT AND CITATION OF AUTHORITY*

Rule 59 states that a new trial may be granted "for any reason for which a new trial has been heretofore been granted in an action at law in federal court." FRCP Rule 59(a)(1)(A). In order to successfully move for a new trial, a party must, therefore, identify a basis that has been recognized as being a valid ground for a new trial. Here, the Plaintiff claims three grounds, none of which are sufficient to require a new trial.

### I.  THE JURY'S VERDICT WAS NOT AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE

New trials granted because a verdict is against the weight of the evidence are proper only when the record shows that the jury's verdict resulted in a miscarriage of justice or where the verdict, on the record, cries to be overturned or shocks the court's conscience. *Latino v. Kaizer*, 58 F. 3d 310, 315 (C.A. 7 1995). Simply because the jury chose to believe some evidence over other evidence does not "demonstrate the miscarriage of justice that would permit the district court to hold the jury's damage verdict was against the weight of the evidence." *Williamson v. Consolidated Rail Corp.*, 926 F.2d 1344, 1354 (C.A. 3 1991).

This presents a significant burden for the moving party. A trial court will not grant new trial unless it is reasonably clear that prejudice or error has crept into the record or that substantial justice has not been done; furthermore, the burden of showing harmful error rests on the party seeking new trial. *Young v. Ethyl Corp.*, 444 F.Supp. 207, 219 (W.D.Ark.1977). On a motion for new trial, the burden for demonstrating error is a heavy one. *Hansen v. Barrett*, 186 F.Supp. 527, 532 (D.C.Minn.1960). The burden of proof on a motion for new trial is on the moving party, and the court should not lightly disturb a plausible jury verdict but, rather, it must be guided by a common sense determination. *Anglo-American General Agents v. Jackson*

334135v.1

*Nat. Life Ins. Co.*, 83 F.R.D. 41, 43 (N.D.Cal.1979). The Plaintiff has clearly failed to meet his required burden here.

### A.    The Jury Properly Rejected Plaintiff's Theory of Defect.

The jury's decision is not against the weight of the evidence presented at trial. In fact, its verdict was consistent with the overwhelming and undisputed evidence. Plaintiff claimed that the subject microwave was defective due to the defect that prompted Whirlpool's recall. Specifically, Plaintiff claimed the fire was caused by the same mechanism as the fires involved in Whirlpool's microwave recall.

The problem is that the trial evidence was inconsistent with the recall problem being the cause of the fire. Larry Latack made it clear that two things were required for the recall failure to occur.

> **Q.** Okay. And from what you were describing, the problem was -- it required a couple of steps. You said you needed to have heavy food contamination or splatter; is that right?
>
> **A.** Yes, and it had to work to a very specific point.
>
> **Q.** It had to work to a specific point. You said it was left unclean, is that something that was necessary in order for this recall failure to occur?
>
> **A.** Yes, just normal usage and cleanup wouldn't lead to a problem.
>
> **Q.** It needed to be sitting there for some period of time?
>
> **A.** Yes.
>
> **Q.** Okay. So if someone was maintaining and regularly cleaning their microwave, that would not be consistent with what you discovered as being sort of the necessary elements for this recall failure?

334135v.1

**A.** Yeah, based on the events we saw and the testing we have done, that wouldn't be consistent.

**Q.** Now, and then in addition to needing that, the product had to be on at the time?

**A.** Yes.

**Q.** Is that what you discovered?

**A.** Yes.

**Q.** Okay. And what's the reason that the product needed to be on in order to have this event take place?

**A.** Because you had to turn that contamination, that grease into smoke and that smoke had to turn into plasma, and without the microwave energy, it's impossible to do that.

**Q.** The two things that you needed was uncleaned splatter or food contamination and the product needed to be on at the time?

**A.** Yes.

See Trial Transcript of Larry Latack, Page 25, Line 14 through Page 26, Line 14 (A copy of the relevant excerpts of the Trial Transcript are attached hereto as Exhibit A). Mr. Latack's testimony was not rebutted by any evidence at trial.

Therefore, the two requirements necessary to prove Plaintiff's theory were: (1) the microwave needed to have spilled or splattered food that went uncleaned for an extended period of time; and (2) the microwave needed to be running. Neither was present.

**Q.** ...Describe the overall cleanliness or non-cleanliness of the microwave as you would call it. Did you keep the microwave clean?

334135v.1

> **A.** I cleaned it often. Yes, I cleaned it often. It was not typical for the
> microwave on the interior to be dirty. I kept it clean. I think you can see
> in some of the photos where you can see that it was clearly clean. It had
> been cleaned even after the splatter.

See Trial Transcript of Allen Plyler (Vol. 2-A), Page 9, Line 24 through Page 10, Line 7 (Ex. A). Plaintiff made it clear that he maintained a "very clean microwave oven." See Trial Transcript of Allen Plyler (Vol. 2-A), Page 38, Line 10 through Line 12.

Additionally, the microwave had not been used for several hours before the fire. Plaintiff clearly testified that the microwave had not been used at any time after he went to bed at around 11:00 p.m.

> **Q.** You went to bed and said [the microwave] wasn't used again?
>
> **A.** Right.

See Trial Transcript of Allen Plyler (Vol. 2-A), Page 40, Line 25 through Page 41, Line 1. The fire was not discovered until 5:00 a.m. some six hours later.

This undisputed evidence establishes that the two necessary elements for the recall failure to occur were not present in the Plaintiff's microwave. However, this is not even the standard for a new trial. The Plaintiff must show the jury's verdict is "shocking" to the Court's conscience. The Plaintiff has made no such showing.

### B. Plaintiff Failed to Show Whirlpool was Negligent in Its Recall.

In his Brief, Plaintiff argues that he presented "a sufficient factual basis" to find Whirlpool failed to notify him of the recall. Again, this is not the standard to award a new trial. Simply presenting evidence of negligence does not mean the jury's verdict shocks the conscience. Rather, the Plaintiff must point to the total lack of any evidence to support the

334135v.1

jury's findings. Here, there was over-whelming evidence that Whirlpool conducted its product recall in a non-negligent manner. The evidence showed that Whirlpool was able to reach and rework 75% of the affected microwave ovens. See Trial Transcript of Larry Latack, pp. 36-37 (Ex. A). Simply because the Plaintiff did not get notice of the recall does not render Whirlpool's efforts negligent. Plaintiff must establish that Whirlpool failed to use ordinary care when it conducted its recall. *See Jablonski v. Ford Motor Co.*, 955 N.E.2d 1138, 1159 (Ill. 2011) (Plaintiffs failed to present sufficient evidence from which a jury could conclude that the defendant manufacturer acted unreasonable, and, therefore, there was insufficient evidence to justify the submission of the claims of negligence to the jury). The overwhelming evidence supports the jury's finding that Whirlpool was not negligent. For this reason, the Plaintiff's Motion for New Trial must be denied.

## II. THE COURT PROPERLY RESTRICTED THE TESTIMONY OF PLAINTIFF ABOUT THE FIRE

Plaintiff next contends that the Court improperly restricted his testimony. On several occasions, Plaintiff attempted to step into the role of a fire cause and origin expert in spite of the fact that he was never designated as one. Plaintiff initially opined that the flames he observed in the microwave "looked more like an electrical fire." See Trial Transcript of Allen Plyler (3/12/12), Page 16, Line 15. Later, he described what *and why* the firefighters were attacking the fire from the roof. See Trial Transcript of Allen Plyler (3/12/12), Page 24, Lines 6-10. This questioning drew an objection that was sustained by the Court.

In spite of the Court's admonition against giving expert opinion testimony, Plaintiff continued as he described photographs from the fire scene.

> **A.** ...What you're seeing from this boarded-up area is, that's acceleration of the fire before they were able to begin to put the fire out. So obviously the fire was

6

> spreading quite rapidly at that time, prior to the fire department arriving and
> being able to put it out.

See Trial Transcript of Allen Plyler (3/12/12), Page 34, Lines 6-10. Following Plaintiff's lecture on fire patterns and the conclusions drawn from them, Defense counsel reiterated an objection to him testifying as an expert. The Court agreed and specifically admonished Plaintiff that he was not an expert and to keep his "responses factual and not speculate or venturing into opinion testimony." See Trial Transcript of Allen Plyler (3/12/12), Page 36, Lines 19 and 24-25.

The next day, Plaintiff continued offering opinions of photographs from the fire. Plaintiff gave his opinion about the content of certain material in one photograph: "...so that just looks to me to be some of the materials that came from up above from the aftermath of the fire. That looks to me like after the fire was completely out, that some of the debris from the home is completely down on the ground." See Trial Transcript of Allen Plyler (3/13/12), Page 8, Lines 1-4. Plaintiff continued to interpret photographs of the microwave and gave his opinion of their meaning:

> So that is the microwave itself, and what you're looking at is the
> top of the microwave after it has been brought down, uninstalled
> from its mounting plate. And you are seeing debris on top, you
> are seeing the charring of the paint from heat it looks like, and in
> the back, it looks like the area that that would normally exhaust
> from.

See Trial Transcript of Allen Plyler (3/13/12), Page 10, Line 23 through Page 11, Line 3. It went on:

7

> **A.** Again, this is the microwave, and on the top part, there's obviously paint that has been discolored and it has obviously been subject to extreme heat. You can see the black, which shows charring.

See Trial Transcript of Allen Plyler (3/13/12), Page 12, Lines 19-22. And continued still further,

> **A.** ...So, again, looking at the back area [of the microwave] that's kind of open, that looks like the area that it would have exhausted from. And then what you see directly on top with all of this (sic) wires there is that's the actual burned power cord. So that area that you see which is not burned which is – and I have to give an approximation of this, but the approximation of this is probably about 8, 12 inches.

See Trial Transcript of Allen Plyler (3/13/12), Page 15, Line 10-17.

Finally, after Plaintiff continued this improper opinion testimony, Defendant objected and asked that Plaintiff, again, be admonished to limit his testimony to what he observed rather than his interpretations of photographs. The Court asked Plaintiff's counsel if he objected to such an admonishment and counsel stated: "No, your Honor. I think that that may solve Mr. Hostetter's concern." See Trial Transcript of Allen Plyler (3/13/12), Page 17, Lines 9-10.

Plaintiff contends all of his own testimony was proper under Rule 701. However, he provides no basis by which the Court can understand how his background and training qualifies him to give opinions about fire patterns from photographs.

> The prototypical example of the type of evidence contemplated by the adoption of Rule 701 [allowing limited lay opinion testimony] relates to the appearance of persons or things, identity, the manner of conduct, competency of a person, degrees of light or darkness, sound, size, weight, distance, and an endless number of items that cannot be described factually in words apart from inferences .... Other examples of this type of quintessential Rule 701 testimony include identification of an individual, the speed of a vehicle, the mental state or responsibility of another, whether another was healthy, the value of one's property.

*Keri v. Board of Trustees of Purdue University*, 458 F.3d 620, 631 (C.A.7 2006). This is why witness testimony has been regularly rejected when it ventures outside the witness' immediate sensory perception. See *Compania Administradora de Recuperacion de Activos Administradora de Fondos de Inversions Sociedad Anonima v. Titan International, Inc*. 533 F.3d 555, 559-61 (C.A.7 2008)(court prohibited witness from offering his opinions about the valuation of collateral based on his experience selling these types of goods since he had not been properly designated as an expert); *U.S. v. Gaytan*, 649 F. 3d 573, 582 (C.A. 7 2011)(officer translating drug jargon was impermissible lay opinion testimony); *U.S. v. Noel*, 581 F. 3d 490, 496-497 (C.A. 7 2009)(witness could not offer his opinion that certain computer images were child pornography).

The Court properly restricted the Plaintiff to offering only factual testimony at trial. His interpretation of the meaning of fire damage and flame patterns from photographs was clearly outside the permissible scope of lay opinion testimony under Rule 701. This exclusion was proper and provides no basis for a new trial.

9

### III.    EVIDENCE OF THE PLAINTIFF'S DIVORCE WAS RELEVANT TO THE PLAINTIFF'S CLAIM FOR DAMAGES

Lastly, Plaintiff argues that he was impermissibly forced to answer questions about his divorce. Plaintiff had already made it clear in his direct examination that he was divorced and his divorce took place shortly after the fire. See Trial Transcript of Allen Plyler, (3/12/12), Page 25, Line 13 through Page 26, Line 10. On direct examination, Plaintiff was also asked about seeing a counselor immediately after being questioned about his divorce. See Trial Transcript of Allen Plyler, (3/12/12), Page 26, Lines 1-10. Plaintiff described the impact of the fire on his emotional state and that it had made him isolated and withdrawn. See Trial Transcript of Allen Plyler, (3/13/12), Page 29, Lines 9-15.

Additionally, Plaintiff's treating counselor reported that Plaintiff's symptoms were consistent with major depression. See Deposition of Rhonda Campbell, pp. 57-58. In fact, Campbell agreed that the Plaintiff was "definitely" depressed after his divorce. See Deposition of Rhonda Campbell, p. 60.

During cross-examination, Defendant sought only to point out that, during the same time that Plaintiff claimed to be suffering isolation and withdrawal due to post-traumatic stress disorder, he also experienced a difficult divorce. During cross-examination, Plaintiff initially refused to concede the divorce was unrelated to the fire ("I'm sure it's related in some way.") See Trial Transcript of Allen Plyler, (3/13/12), Page 62, Line 4. Justifiably, Defendant was entitled to discuss Plaintiff's divorce under these circumstances. Plaintiff objected only once to this line of questions and was overruled.

It is not reversible error to admit relevant evidence that is not unduly prejudicial. *E.E.O.C. v. Management Hospitality of Racine, Inc.*, 666 F.3d 422, 440-41 (C.A.7 2012). Evidence is relevant if it has "any tendency to make the existence of any fact that is of

334135v.1

consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed.R.Evid. 401. Relevant evidence may be excluded, however, "if its probative value is substantially outweighed by the danger of unfair prejudice...." Fed.R.Evid. 403. Clearly, evidence tending to show other causes for the Plaintiff's alleged emotional problems was relevant and admissible. The Court did not error in allowing this brief line of questioning. A new trial is not warranted on this basis.

## CONCLUSION

The Plaintiff has presented no basis upon which to grant a new trial. The jury's verdict was supported by the evidence and there is no evidence that it resulted from manifest error or prejudice to his rights. Accordingly, Plaintiff's Motion for New trial should be denied.

This 11th day of May, 2012.

**WHIRLPOOL CORPORATION**

By: /s/ Michael D. Hostetter
           One of Its Attorneys

Marc S. Silver
James E. Michel
BARNES & THORNBURG LLP
One N. Wacker Drive, Suite 4400
Chicago, IL 60606
Telephone:   (312) 357-1313
Facsimile:    (312) 759-5646
Email: msilver@btlaw.com
       jmichel@btlaw.com

Michael D. Hostetter (*Pro Hac Vice*)
NALL & MILLER, LLP
235 Peachtree Street, NE
Suite 1500 – North Tower
Atlanta, Georgia 30303
Telephone:   (404)522-2200
Facsimile:    (404)522-2208
Email: mhostetter@nallmiller.com

334135v.1

**EXHIBIT "A"**



1

1        IN THE UNITED STATES DISTRICT COURT
             NORTHERN DISTRICT OF ILLINOIS
2                  EASTERN DIVISION

3

4    ALLEN PLYLER,                    )    Docket No. 08 C 6637
                                      )
5                    Plaintiff,       )
                                      )
6         vs.                         )
                                      )
7    WHIRLPOOL CORPORATION,           )    Chicago, Illinois
                                      )    March 13, 2012
8                    Defendant.       )    1:30 o'clock p.m.

9

10          TRIAL TRANSCRIPT OF PROCEEDINGS - EXCERPT
     BEFORE THE HONORABLE MAGISTRATE JUDGE GERALDINE SOAT BROWN
11                       VOLUME 2-B

     APPEARANCES:
12

13   For the Plaintiff:      MOLZAHN, ROCCO, REED & ROUSE, LLC
                             BY:  MR. SCOTT SKALETSKY
14                           20 North Clark Street, Suite 2300
                             Chicago, IL  60602
15                           (312) 917-1880

16   For the Defendant:      BARNES & THORNBURG
                             BY:  MR. JAMES E. MICHEL
17                           One North Wacker Drive, Suite 4400
                             Chicago, IL  60606
18                           (312) 357-1313

19

20   NOTE:   THIS IS A PARTIAL TRANSCRIPT.  IN THE EVENT OF AN
             APPEAL, PLEASE CHECK TO SEE IF A FULL TRANSCRIPT
21           IS ON FILE.  IF ONE IS, USE THE PAGINATION OF
             THAT TRANSCRIPT.
22

23

     Court Reporter:         MS. CAROLYN R. COX, CSR, RPR, CRR, FCRR
24                           Official Court Reporter
                             219 S. Dearborn Street, Suite 1854-B
25                           Chicago, Illinois  60604
                             (312) 435-5639

| | | |
|---|---|---|
| 12:35:18 | 1 | toward your mouth and talk into it. |
| 12:35:28 | 2 | Just one second. It's adjustable, so you can raise |
| 12:35:30 | 3 | it and lower it. Point it toward your mouth. Good. |
| 12:35:22 | 4 | - - - |
| 12:35:22 | 5 | LARRY DAVID LATACK, DIRECT EXAMINATION |
| 12:35:22 | 6 | BY MR. SKALETSKY: |
| 12:35:32 | 7 | Q. Sir, would you state you're your full name and spell your |
| 12:35:36 | 8 | last name for us. |
| 12:35:38 | 9 | A. Larry David Latack, L-a-t-a-c-k. |
| 12:35:42 | 10 | Q. Mr. Latack, what's your job or your employment? |
| 12:35:44 | 11 | A. I am the director of global product safety at Whirlpool. |
| 12:35:48 | 12 | Q. And for how long have you been the director of global |
| 12:35:52 | 13 | product safety? |
| 12:35:52 | 14 | A. My current position, I have been in there for six years. |
| 12:35:56 | 15 | Q. Okay. And specifically as the director of global product |
| 12:36:02 | 16 | safety, what is your task or your role? |
| 12:36:04 | 17 | A. We have four areas that we get involved with. One is |
| 12:36:10 | 18 | working with engineering to help ensure that we are making |
| 12:36:14 | 19 | safe products, designing safe products. The other is on the |
| 12:36:18 | 20 | active investigations where there's incidents in the field, |
| 12:36:22 | 21 | working with engineering to assess it, make sure the -- |
| 12:36:26 | 22 | determine what the risk level is, if there is risk, for the |
| 12:36:30 | 23 | consumers. The other is governmental liaison. I work with |
| 12:36:34 | 24 | government regulatory agencies that deal with safety or my |
| 12:36:40 | 25 | organization does. And the final area because of the |

01:09:42   1   A.  Yes.

01:09:48   2   Q.  Now, to be clear, you were asked several questions about

01:09:52   3   the magnatron and the waveguide, and you answered the question

01:09:58   4   that there was not a problem with either two of those

01:10:02   5   products.  In terms of what Whirlpool discovered that prompted

01:10:04   6   the recall, neither one of those components was a problem; is

01:10:08   7   that right?

01:10:08   8   A.  Correct.

01:10:08   9   Q.  Okay.  And from what you were describing, the problem was

01:10:14   10   -- it required a couple of steps.  You said you needed to have

01:10:16   11   heavy food contamination or splatter; is that right?

01:10:20   12   A.  Yes, and it had to work to a very specific point.

01:10:24   13   Q.  It had to work to a specific point.  You said it was left

01:10:28   14   unclean, is that something that was necessary in order for

01:10:32   15   this recall failure to occur?

01:10:34   16   A.  Yes, just normal usage and cleanup wouldn't lead to a

01:10:38   17   problem.

01:10:38   18   Q.  It needed to be sitting there for some period of time?

01:10:40   19   A.  Yes.

01:10:40   20   Q.  Okay.  So if someone was maintaining and regularly

01:10:44   21   cleaning their microwave, that would not be consistent with

01:10:46   22   what you discovered as being sort of the necessary elements

01:10:50   23   for this recall failure?

01:10:52   24   A.  Yeah, based on the events we saw and the testing we have

01:10:56   25   done, that wouldn't be consistent.

| | | |
|---|---|---|
| 01:10:58 | 1 | Q. Now, and then in addition to needing that, the product had |
| 01:11:04 | 2 | to be on at the time? |
| 01:11:06 | 3 | A. Yes. |
| 01:11:06 | 4 | Q. Is that what you discovered? |
| 01:11:06 | 5 | A. Yes. |
| 01:11:06 | 6 | Q. Okay. And what's the reason that the product needed to be |
| 01:11:10 | 7 | on in order to have this event take place? |
| 01:11:14 | 8 | A. Because you had to turn that contamination, that grease |
| 01:11:22 | 9 | into smoke and that smoke had to turn into plasma, and without |
| 01:11:26 | 10 | the microwave energy, it's impossible to do that. |
| 01:11:28 | 11 | Q. The two things that you needed was uncleaned splatter or |
| 01:11:32 | 12 | food contamination and the product needed to be on at the |
| 01:11:34 | 13 | time? |
| 01:11:34 | 14 | A. Yes. |
| 01:11:34 | 15 | Q. Okay. Now, once Whirlpool elected to go to the Consumer |
| 01:11:42 | 16 | Product Safety Commission -- and did Whirlpool go voluntarily; |
| 01:11:46 | 17 | it went to the Consumer Product Safety Commission as opposed |
| 01:11:50 | 18 | to the Consumer Product Safety Commission coming to it? |
| 01:11:52 | 19 | A. We initiated the contact. The CPSC wasn't aware of the |
| 01:11:56 | 20 | situation. |
| 01:11:56 | 21 | Q. Okay. So on behalf of Whirlpool, your department would be |
| 01:12:00 | 22 | the one that interfaced with the Consumer Product Safety |
| 01:12:02 | 23 | Commission? |
| 01:12:02 | 24 | A. Yes. |
| 01:12:02 | 25 | Q. Okay. Now, there was -- and there's some mention in the |

1

1        IN THE UNITED STATES DISTRICT COURT
              NORTHERN DISTRICT OF ILLINOIS
2                    EASTERN DIVISION

3

4    ALLEN PLYLER,                        )    Docket No. 08 C 6637

5                          Plaintiff,     )

6              vs.                         )

7    WHIRLPOOL CORPORATION,               )    Chicago, Illinois
                                          )    March 13, 2012
8                          Defendant.     )    9:00 o'clock a.m.

9
            TRIAL TRANSCRIPT OF PROCEEDINGS - EXCERPT
10   BEFORE THE HONORABLE MAGISTRATE JUDGE GERALDINE SOAT BROWN
                            VOLUME 2-A
11
     APPEARANCES:
12
     For the Plaintiff:     MOLZAHN, ROCCO, REED & ROUSE, LLC
13                          BY:  MR. SCOTT SKALETSKY
                            20 North Clark Street, Suite 2300
14                          Chicago, IL  60602
                            (312) 917-1880
15

16   For the Defendant:     BARNES & THORNBURG
                            BY:  MR. JAMES E. MICHEL
17                          One North Wacker Drive, Suite 4400
                            Chicago, IL  60606
18                          (312) 357-1313

19

20   NOTE:   THIS IS A PARTIAL TRANSCRIPT.  IN THE EVENT OF AN
             APPEAL, PLEASE CHECK TO SEE IF A FULL TRANSCRIPT
21           IS ON FILE.  IF ONE IS, USE THE PAGINATION OF
             THAT TRANSCRIPT.
22

23
     Court Reporter:        MS. CAROLYN R. COX, CSR, RPR, CRR, FCRR
24                          Official Court Reporter
                            219 S. Dearborn Street, Suite 1854-B
25                          Chicago, Illinois  60604
                            (312) 435-5639

2

1

# I N D E X

2

3    DESCRIPTION                                                    PAGE

4

5    ALLEN PLYLER, DIRECT EXAMINATION CONTINUED                     6
     BY MR. SKALETSKY:

6

7    ALLEN PLYLER, CROSS-EXAMINATION                               33
     BY MR. HOSTETTER:

8

9    ALLEN PLYLER, REDIRECT EXAMINATION                            75
     BY MR. SKALETSKY:

10

11   ALLEN PLYLER, RECROSS-EXAMINATION                             79
     BY MR. HOSTETTER:

12

13

14

15

16

17

18

19

20

21

22

23

24

25

| | | |
|---|---|---|
| 08:48:50 | 1 | Q. But it had been on, whether you turned it on or your house |
| 08:48:52 | 2 | guest? |
| 08:48:52 | 3 | A. It had been operational, it had been used. It had been |
| 08:48:56 | 4 | used in its normal function the night prior. |
| 08:48:58 | 5 | Q. Is it possible that the microwave was on shortly before |
| 08:49:06 | 6 | you were notified of the fire? |
| 08:49:08 | 7 | A. So in being notified of the fire, I was being woken up and |
| 08:49:14 | 8 | told that there was a fire, so is it possible that it was on |
| 08:49:18 | 9 | prior to that? |
| 08:49:18 | 10 | Q. Yes. |
| 08:49:20 | 11 | A. Not to my knowledge. |
| 08:49:22 | 12 | Q. But were you sleeping at the time your house guest woke |
| 08:49:28 | 13 | you up? |
| 08:49:28 | 14 | A. I was sleeping. It was 5:00 o'clock in the morning. |
| 08:49:32 | 15 | Q. Do you know what your housemate was using the microwave |
| 08:49:42 | 16 | for when it was on? |
| 08:49:44 | 17 | A. I believe it was baked beans that had been baked or cooked |
| 08:49:50 | 18 | in the microwave and they were overheated, and so when they |
| 08:49:54 | 19 | were overheated, they had -- I don't know how to describe it, |
| 08:50:00 | 20 | but it basically had blown up inside of the microwave. There |
| 08:50:04 | 21 | had been some sort of an overheating and it splattered inside |
| 08:50:08 | 22 | the microwave, and then after that, obviously, it was cleaned |
| 08:50:12 | 23 | up. |
| 08:50:14 | 24 | Q. That was going to be my next question. Describe for me |
| 08:50:18 | 25 | the overall cleanliness or non-cleanliness of the microwave as |

08:50:26  1   you would call it. Did you keep the microwave clean?

08:50:28  2   A. I cleaned it often. Yes, I cleaned it quite often. It

08:50:32  3   was not typical for the microwave on the interior to be dirty.

08:50:38  4   I kept it clean, and even after that splatter, it was

08:50:42  5   completely clean. I think you can see in some of the photos

08:50:48  6   where you can see that it was clearly clean. It had been

08:50:50  7   cleaned even after the splatter.

08:50:52  8   Q. I am going to show you some additional photographs, Allen.

08:50:58  9        MR. SKALETSKY: These are from Plaintiff's Exhibit

08:51:04  10  No. 5, your Honor.

08:51:06  11       THE COURT: Okay.

08:51:08  12  BY MR. SKALETSKY:

08:51:08  13  Q. This first picture is photograph No. 28 of Plaintiff's

08:51:14  14  Exhibit 5. Do you know what's depicted in that photograph,

08:51:22  15  Allen?

08:51:22  16       THE COURT: Can you blow that up a little larger? Is

08:51:24  17  it possible?

08:51:26  18       MR. SKALETSKY: Sure.

08:51:26  19       THE COURT: It's a little hard to see.

08:51:30  20       Okay. Good.

08:51:30  21  BY MR. SKALETSKY:

08:51:34  22  Q. Can you --

08:51:36  23  A. So that is the microwave itself, and what you're looking

08:51:40  24  at is the top of that microwave after it has been brought

08:51:44  25  down, uninstalled from its mounting plate. And you are seeing

09:40:42  1  Q.  Now, in terms of your usage of the microwave, you said
09:40:48  2  already the microwave performed fine for you, you had no
09:40:50  3  problems with it cooking other than, you know, when you were
09:40:54  4  using it at least overheating some water, that sort of thing,
09:40:56  5  right?
09:40:56  6  A.  Or if I overcooked soup or overcooked beans, yes, the
09:41:04  7  microwave worked and functioned as you would expect.
09:41:06  8  Q.  Right.
09:41:08  9      And in terms of any spills that you had, you said
09:41:12  10  earlier today you cleaned them up, you maintained a very clean
09:41:14  11  microwave oven, right?
09:41:16  12  A.  Yes, I did.
09:41:18  13  Q.  So if there was any splatter, you were immediately
09:41:20  14  cleaning that up?
09:41:20  15  A.  For the areas that I could access.  Obviously, that was as
09:41:26  16  you open the microwave door and all the insides there, that
09:41:30  17  was what was cleaned.
09:41:30  18  Q.  Sure.
09:41:30  19      Now, when you bought the microwave, you had mentioned
09:41:34  20  earlier that you had a Use and Care Guide, and counsel had
09:41:38  21  admitted that into evidence.  You said you glanced at the Use
09:41:44  22  and Care Guide when you bought the product.  The front page of
09:41:58  23  this is the use -- this is the front cover of your Use and
09:42:06  24  Care Guide, right, you said you glanced at it?
09:42:10  25      THE COURT:  Let's refer to this as Plaintiff's

09:43:32  1  came with this product?

09:43:32  2  A.  I don't remember getting a card or completing a card.

09:43:36  3  Q.  Okay.  Again, you're not saying you didn't get a card; you

09:43:42  4  just don't remember getting one and filling one out?

09:43:48  5  A.  I don't remember filling one out, no.

09:43:48  6  Q.  Now, that night, the night before the fire, you had a

09:43:54  7  house guest.  You have been referring to this person as a

09:43:58  8  house guest.  Her name was Kathleen Stuckey who was a friend,

09:44:00  9  right?

09:44:00  10  A.  Right.

09:44:02  11  Q.  And she had agreed to get the house ready.  I think you

09:44:04  12  were transitioning from Chicago to San Francisco.  She had

09:44:06  13  agreed to help you get things ready to move out to San

09:44:12  14  Francisco?

09:44:12  15  A.  To help clean.

09:44:12  16  Q.  You went to bed after she had heated up some stuff the

09:44:18  17  night before, and the last thing you know -- well, you went to

09:44:20  18  bed, and the next thing you realized, she was waking you up to

09:44:24  19  tell you there was a fire in the kitchen, right?

09:44:26  20  A.  Well, I mean, there were other events that occurred there.

09:44:32  21  I mean, I saw the microwave being cleaned.

09:44:34  22  Q.  Okay.  Before -- yeah, you saw the microwave being cleaned

09:44:38  23  the night before?

09:44:40  24  A.  Right.

09:44:40  25  Q.  You went to bed and said it wasn't used again?

09:44:44    1    A. Right.

09:44:44    2    Q. You were woken up at 5:00 o'clock by Ms. Stuckey who told

09:44:48    3    you there was a fire in the kitchen, and that's when you came

09:44:50    4    downstairs and observed the glows in the area of the grille in

09:44:54    5    the top part of the microwave oven, correct?

09:44:56    6    A. Correct.

09:44:56    7    Q. If you look through that grille area, that would also be

09:45:00    8    the area where the power cord exits that and goes through that

09:45:04    9    wall to the outlet, doesn't it?

09:45:04    10    A. I believe that the power cord is in the back of the unit,

09:45:10    11    not in the front, so where I was seeing the fire was -- the

09:45:12    12    three glowing areas was much closer to that area versus where

09:45:18    13    the power cord was.

09:45:18    14    Q. But the power cord does exit in the rear at the top part

09:45:22    15    of the microwave, doesn't it, sir?

09:45:24    16    A. I believe it does.

09:45:24    17    Q. Okay. And you went downstairs after Ms. Stuckey woke you

09:45:28    18    up and you observed the fire in the kitchen area and you

09:45:34    19    talked about the microwave.

09:45:42    20    When you go downstairs in the house -- and I want to

09:45:44    21    show you what we have marked as Defendant's Exhibit 6-A, which

09:45:56    22    is a copy of the floor plan of your house generally. Do you

09:46:02    23    recognize that as being a copy of the floor plan of your

09:46:06    24    house? Again, I will zoom it in, if you'd like me to, just a

09:46:10    25    little bit.

1               IN THE UNITED STATES DISTRICT COURT
                    NORTHERN DISTRICT OF ILLINOIS
2                         EASTERN DIVISION

3   ALLEN PLYLER,                    )    Docket No. 08 C 6637
                                     )
4                     Plaintiff,     )
                                     )
5            v.                      )    Chicago, Illinois
                                     )    March 12, 2012
6   WHIRLPOOL CORPORATION,           )    1:15 o'clock p.m.
                                     )
7                     Defendant.     )

8                   EXCERPT OF (Plyler direct)
                 TRANSCRIPT OF PROCEEDINGS - TRIAL
9      BEFORE THE HONORABLE GERALDINE SOAT BROWN, and a jury

10  APPEARANCES:

11  For the Plaintiff:           MOLZAHN, ROCCO, REED &
                                 ROUSE, LLC., by
12                               MR. SCOTT SKALETSKY
                                 20 North Clark Street
13                               Suite 2300
                                 Chicago, Illinois 60602
14
    For the Defendant:           BARNES & THORNBURG, by
15                               MR. JAMES. E. MICHEL
                                 One North Wacker Drive
16                               Suite 4400
                                 Chicago, Illinois 60606
17
                                 NALL & MILLER, LLP., by
18                               MR. MICHAEL D. HOSTETTER
                                 235 Peachtree Street, N.E.
19                               North Tower
                                 Suite 1500
20                               Atlanta, Georgia 30303

21

22
                         ALEXANDRA ROTH, CSR, RPR
23                       Official Court Reporter
                      219 South Dearborn Street
24                           Room 1224
                       Chicago, Illinois 60604
25                          (312) 408-5038

1   of the bedroom and I turned on the light in the hallway, the

2   light in the hallway came on.  When I came down to the kitchen

3   and I turned the kitchen lights on, the kitchen lights came on

4   as well.

5   Q.  Okay.  Did you feel emission of any heat while you were in

6   the kitchen or going up the stairs to your bedroom?

7   A.  Going upstairs to the bedroom there wasn't any noticeable

8   heat.  At the microwave there was noticeable heat coming from

9   the microwave from where that source of heat was at the top.

10  Q.  All right.  What about -- what about smoke?  Was there any

11  smoke coming from anywhere?

12  A.  There -- at first when I saw the flames in the microwave,

13  there might have been a small amount of smoke.  But it didn't

14  seem to be producing a lot of smoke in the microwave itself.

15  It looked more like an electrical fire.

16  Q.  All right.  Where did you see the smoke that you described

17  for us that you did -- where was it?  Was it around the

18  microwave or in front or in back?  How was it?

19  A.  Well, I had already gone upstairs, and I had already come

20  back with the phone and was continuing to try to throw water on

21  what I saw is the fire in the microwave before I really saw

22  smoke.  What happened was, the cabinetry -- so if you go back

23  to this picture.

24  Q.  Okay.

25          MR. SKALETSKY:  Again, your Honor, this is Plyler 205.

Plyler - direct                    24

1   A.   Well, you know, they -- I guess they did their job.   They
2   prepared to analyze the best way to attack the fire.   It seemed
3   to take a long time for them to get in the position.   And then
4   they went into the home and began poking holes into walls and
5   trying to discover where the fire was.

6        And they also got up on the roof and were poking holes
7   into the roof to identify where the fire was.   And then they
8   put water hoses down from the roof and were spraying down into
9   the attic and in between the walls to put the fire out.
10  Q.   Did they eventually locate the source of the fire?

11       MR. HOSTETTER:   I object, your Honor.   I believe it's
12  calling for opinion testimony that this witness isn't capable
13  of doing.   If we're going to hear it, at least come from the
14  fire apartment.

15       THE COURT:   Sustained.

16       MR. SKALETSKY:   Thank you.

17  BY MR. SKALETSKY:

18  Q.   Did you leave the house under your own power, Allen?

19  A.   Yes.

20  Q.   Did you speak to the fire personnel when they arrived at
21  the house?

22  A.   Not exactly when they arrived.   But I did speak to the fire
23  chief as they were in the process of putting out the fire.   It
24  took a while to put out the fire.

25  Q.   Okay.

1   you can see that the chimney itself is all charred.  And what I
2   saw when I saw the fire from outside was, I saw the flames
3   coming up alongside the chimney and going up into the air
4   anywhere from ten to 15 feet straight up in flames at that
5   point.

6           What you're seeing from this boarded-up area is,
7   that's the acceleration of the fire before they were able to
8   begin to put the fire out.  So obviously the fire was spreading
9   quite rapidly at that time, prior to the fire department
10  arriving and being able to put it out.

11          What you're seeing on the blue tarp is, because of
12  where it had burned through the roof, they put the tarp up to
13  try to protect it from rain coming in.  But it was actually
14  ineffective because of how many holes there were.  And rain did
15  end up seeping and causing additional damage, water damage, to
16  the floors and other parts.

17  Q.  Where is -- where is the kitchen in this photograph, Allen?
18  A.  It's right beside where that lower sliding glass door is.
19  Q.  On the right?  To the left?
20  A.  Where you first pointed.
21  Q.  Oh, okay.

22          THE COURT:  May I ask, counsel, how much more do you
23  have with the witness?

24          MR. SKALETSKY:  Probably at least another half an
25  hour, forty-five minutes.

1    this room, where Ms. Fratto is now taking you, not the second

2    floor.  This room right here.  That's where the snacks will be.

3          (Jury exited the courtroom.)

4          THE COURT:  Everyone may be seated.  Counsel, is there

5    anything else for tonight before we recess?

6          MR. SKALETSKY:  Not for tonight, your Honor.  I will

7    start with Mr. Plyler tomorrow morning.

8          MR. HOSTETTER:  Your Honor, nothing.  Although if I

9    could, I was going to come up to the bench at some point.  You

10   know, I objected once to the witness stepping over the line in

11   terms of either hearsay testimony about fire cause.  He's

12   getting awful close.  I don't think he stepped over the line,

13   but getting close to kicking up some chalk on the sideline

14   about being a fire expert, talking about accelerant and

15   describing the fire.

16          I have no problem having him describe what he saw.

17   But he's getting awfully close to venturing and giving expert

18   testimony, which I think is improper.

19          THE COURT:  Well, Mr. Plyler, you are not an expert on

20   the area of fire causes, or you haven't been tendered as such.

21          So I would just instruct counsel to keep the questions

22   factual.

23          MR. SKALETSKY:  Yes.

24          THE COURT:  And keep the responses factual and not

25   speculative or venturing into opinion testimony.

| | | |
|---|---|---|
| 08:47:00 | 1 | so that just looks to me to be some of the material that came |
| 08:47:04 | 2 | from up above from the aftermath of the fire. That looks to |
| 08:47:08 | 3 | me like after the fire was completely out, that some of the |
| 08:47:12 | 4 | debris from the home is completely down on the ground. |
| 08:47:16 | 5 | MR. SKALETSKY: Thank you. Your Honor, I want to |
| 08:47:18 | 6 | show Mr. Plyler 188. This is Exhibit 6, No. 188. |
| 08:47:26 | 7 | BY MR. SKALETSKY: |
| 08:47:28 | 8 | Q. Again, Allen, I'm asking you if you recognize what's -- |
| 08:47:32 | 9 | the objects that are depicted in that photograph? |
| 08:47:36 | 10 | A. Well, again, that looks like plywood that was covering |
| 08:47:44 | 11 | right above where the bathroom area was, and it looks like |
| 08:47:52 | 12 | burns along that area. I am not sure exactly how it ended up |
| 08:48:00 | 13 | there on the ground, but that was a part of the home. |
| 08:48:04 | 14 | Q. All right. Thank you. |
| 08:48:06 | 15 | MR. SKALETSKY: Your Honor, I move for the admission |
| 08:48:06 | 16 | of Exhibits Nos. 186 and 188 of Plaintiff's Exhibit 6. |
| 08:48:12 | 17 | THE COURT: Okay. I think we did admit those. |
| 08:48:16 | 18 | MR. SKALETSKY: Okay. Thank you. |
| 08:48:18 | 19 | BY MR. SKALETSKY: |
| 08:48:20 | 20 | Q. Allen, I want to turn our attention back to the time of |
| 08:48:26 | 21 | the fire. Had you used the microwave that night before you |
| 08:48:34 | 22 | went to sleep? |
| 08:48:34 | 23 | A. I had not done any use of the microwave, but the house |
| 08:48:44 | 24 | guest had prepared some things in the microwave. So the |
| 08:48:48 | 25 | microwave had been used, but I hadn't used it. |

| | |
|---|---|
| 08:50:26 | 1 |
| 08:50:28 | 2 |
| 08:50:32 | 3 |
| 08:50:38 | 4 |
| 08:50:42 | 5 |
| 08:50:48 | 6 |
| 08:50:50 | 7 |
| 08:50:52 | 8 |
| 08:50:58 | 9 |
| 08:51:04 | 10 |
| 08:51:06 | 11 |
| 08:51:08 | 12 |
| 08:51:08 | 13 |
| 08:51:14 | 14 |
| 08:51:22 | 15 |
| 08:51:22 | 16 |
| 08:51:24 | 17 |
| 08:51:26 | 18 |
| 08:51:26 | 19 |
| 08:51:30 | 20 |
| 08:51:30 | 21 |
| 08:51:34 | 22 |
| 08:51:36 | 23 |
| 08:51:40 | 24 |
| 08:51:44 | 25 |

you would call it.  Did you keep the microwave clean?

A.  I cleaned it often.  Yes, I cleaned it quite often.  It was not typical for the microwave on the interior to be dirty. I kept it clean, and even after that splatter, it was completely clean.  I think you can see in some of the photos where you can see that it was clearly clean.  It had been cleaned even after the splatter.

Q.  I am going to show you some additional photographs, Allen.

MR. SKALETSKY:  These are from Plaintiff's Exhibit No. 5, your Honor.

THE COURT:  Okay.

BY MR. SKALETSKY:

Q.  This first picture is photograph No. 28 of Plaintiff's Exhibit 5.  Do you know what's depicted in that photograph, Allen?

THE COURT:  Can you blow that up a little larger?  Is it possible?

MR. SKALETSKY:  Sure.

THE COURT:  It's a little hard to see.

Okay.  Good.

BY MR. SKALETSKY:

Q.  Can you --

A.  So that is the microwave itself, and what you're looking at is the top of that microwave after it has been brought down, uninstalled from its mounting plate.  And you are seeing

| | | |
|---|---|---|
| 08:51:50 | 1 | debris on the top, you are seeing the charring of the paint |
| 08:51:52 | 2 | from heat it looks like, and in the back, it looks like the |
| 08:51:58 | 3 | area that that would normally exhaust from. |
| 08:52:02 | 4 | Q. Okay. |
| 08:52:02 | 5 | A. And then to the right it looks like the power cord itself |
| 08:52:06 | 6 | from the microwave. |
| 08:52:08 | 7 | Q. All right. |
| 08:52:10 | 8 | MR. SKALETSKY: I would move Exhibit No. 28 into |
| 08:52:12 | 9 | evidence, your Honor. |
| 08:52:14 | 10 | THE COURT: Any objection? |
| 08:52:14 | 11 | MR. HOSTETTER: No objection. |
| 08:52:16 | 12 | THE COURT: It will be admitted. That's photograph |
| 08:52:18 | 13 | 28 from Plaintiff's Exhibit -- Group Exhibit 5. |
| 08:52:24 | 14 | (Above-mentioned exhibit was received in evidence.) |
| 08:52:24 | 15 | MR. SKALETSKY: Yes. |
| 08:52:24 | 16 | BY MR. SKALETSKY: |
| 08:52:24 | 17 | Q. Let me show you this photograph, Allen, and ask if you |
| 08:52:32 | 18 | recognize what's depicted in that photograph. |
| 08:52:34 | 19 | A. Again, that's the microwave, and the area on top is the |
| 08:52:40 | 20 | area where I saw the three glowing orange flame areas, and |
| 08:52:46 | 21 | that's where the burn marks are evident, and then the door is |
| 08:52:50 | 22 | open and the control panel is to the right, and you can see |
| 08:52:56 | 23 | the rack for the microwave in the microwave there. |
| 08:53:02 | 24 | Q. And does that picture show the interior or the inside of |
| 08:53:06 | 25 | the microwave as well? |

08:53:06  1   A.  It does.

08:53:06  2   Q.  And it has -- as you're looking at that picture, Allen, do

08:53:16  3   you see anything that indicates food spillage or any other

08:53:22  4   contamination on the inside?

08:53:24  5   A.  It's not easy to see in that picture.  Obviously, there's

08:53:28  6   material that has fallen down into the bottom, but if you look

08:53:32  7   at the back area, it looks very clean and the sides look clean

08:53:38  8   as well.  I don't see any evidence of food.

08:53:40  9   Q.  Okay.  Thank you.

08:53:42  10              MR. SKALETSKY:  Your Honor, we would move Plyler No.

08:53:46  11  20 as part of Plaintiff's Exhibit 5 into evidence.

08:53:48  12              THE COURT:  No. 20.  Any objection?

08:53:50  13              MR. HOSTETTER:  No objection, your Honor.

08:53:50  14              THE COURT:  Okay.  It will be admitted.

08:53:56  15     (Above-mentioned exhibit was received in evidence.)

08:53:58  16  BY MR. SKALETSKY:

08:54:00  17  Q.  Let me show you one more photograph.  Would you describe

08:54:12  18  what you see in that photograph, Allen?

08:54:12  19  A.  Again, this is the microwave, and on the top part, there's

08:54:18  20  obviously paint that has been discolored and it has obviously

08:54:28  21  been subject to extreme heat.  You can see the black, which

08:54:32  22  shows charring from fire.

08:54:34  23              In the front, you can see the gate of the plastic

08:54:40  24  that was at the top of the microwave, and through that

08:54:44  25  particular vents that you see there, that's where I saw the

08:58:52   1   A.  So looking --

08:58:54   2           THE COURT:  Do you have a number here?

08:58:58   3           MR. SKALETSKY:  Yes, your Honor.  This is No. 226 of

08:59:00   4   Exhibit 7.

08:59:02   5           THE COURT:  Okay.

08:59:04   6   BY MR. SKALETSKY:

08:59:04   7   Q.  What do you recognize that to be, if you do, Allen?

08:59:06   8   A.  So the -- this looks like a top view, in other words, a

08:59:12   9   picture taken from on top of the microwave, and so that looks

08:59:16  10   like the very top of the microwave.  So, again, looking at the

08:59:20  11   back area that's kind of open, that looks like the area that

08:59:24  12   it would have exhausted from.  And then what you see directly

08:59:28  13   on top with all of this wires there is that's the actual

08:59:34  14   burned power cord.  So the area that you see which is not

08:59:38  15   burned which is -- and I have to give an approximation of

08:59:44  16   this, but the approximation of this is probably about 8, 12

08:59:48  17   inches.

08:59:48  18           MR. HOSTETTER:  Your Honor.

08:59:52  19           THE COURT:  There is an objection.

08:59:54  20           MR. HOSTETTER:  May I approach?

08:59:56  21           THE COURT:  Yes.  Let's go into a sidebar if we need

08:59:58  22   to because the courtroom doesn't have a way to minimize.

08:59:58  23       (Whereupon, the following further proceedings were had in

09:00:36  24   chambers, out of the hearing of the jury:)

09:00:36  25           MR. HOSTETTER:  Your Honor, the objection that I have

09:01:50  1   Allen was explaining what he saw. He talked about the three
09:01:54  2   orange glowing spots and then the accelerating fire. He is
09:02:00  3   not testifying as a fire exert. He is not saying that -- he
09:02:06  4   is not expressing any opinions. He is testifying to what he
09:02:08  5   recalled seeing.
09:02:10  6        THE COURT: All right. Do you object then to my --
09:02:12  7   would you object if I instructed him to confine his testimony
09:02:16  8   to what he observed rather than interpretations?
09:02:20  9        MR. SKALETSKY: No, your Honor. I think that that
09:02:22  10  may solve Mr. Hostetter's concern.
09:02:26  11       THE COURT: Okay. Then I will do that. All right.
09:03:00  12  (The following proceedings were had in open court in the
09:03:04  13  presence and hearing of the jury:)
09:03:04  14       THE COURT: Now, Mr. Plyler, I am instructing you to
09:03:06  15  confine your testimony to what you observed rather than your
09:03:10  16  interpretation of what you observed. Do you understand the
09:03:16  17  distinction I am drawing here? Just say what you saw and not
09:03:20  18  get into interpreting whether there are burn patterns or what
09:03:24  19  the burn patterns reflect. Do you understand what I am
09:03:28  20  saying?
09:03:28  21       THE WITNESS: Okay.
09:03:30  22       THE COURT: All right. Then let's proceed.
09:03:32  23       MR. SKALETSKY: Thank you, your Honor.
09:03:32  24       THE WITNESS: So I'd like to continue about what I am
09:03:36  25  observing on this particular aspect here.

| | | |
|---|---|---|
| 09:16:16 | 1 | reaction that's hard to describe, but I don't feel like |
| 09:16:20 | 2 | myself. I feel like something is happening in my head. I |
| 09:16:24 | 3 | don't know if I am going to be sick, and I haven't been sick, |
| 09:16:30 | 4 | but I have been -- I have felt as though I could be able to |
| 09:16:36 | 5 | throw up. It's something that occurs in my stomach. It's a |
| 09:16:40 | 6 | physical reaction. It's limiting from the standpoint that I |
| 09:16:46 | 7 | don't feel normal. And so I have tried to not think about |
| 09:16:50 | 8 | this or not talk about this as much as I can. |
| 09:16:54 | 9 | Q. Did you eventually tell your parents about the fire? |
| 09:17:00 | 10 | A. Yes, I did. I believe the fire had happened in October |
| 09:17:06 | 11 | 11th. I believe around February I talked to them and told |
| 09:17:10 | 12 | them about this, |
| 09:17:10 | 13 | Q. Okay. How about your wife at that point, had you divorced |
| 09:17:20 | 14 | your wife by the time you told her? |
| 09:17:22 | 15 | A. No. No. I actually told her because one of the things |
| 09:17:26 | 16 | that had happened was I had had to go back to Illinois from |
| 09:17:32 | 17 | California a number of times to manage the construction and to |
| 09:17:36 | 18 | work through the rebuild, and each time I went, it was again |
| 09:17:40 | 19 | another trip and I would have a week that I would be gone and |
| 09:17:44 | 20 | I would come back. To perform the work that I did, I could |
| 09:17:48 | 21 | work locally, so I could be in Illinois and continue to work |
| 09:17:52 | 22 | and function and then manage the events that I had. But one |
| 09:17:56 | 23 | of the issues that came up was the fact that I was taking |
| 09:18:00 | 24 | these business trips, and so finally I had to explain to her |
| 09:18:04 | 25 | why I was gone so much, and so I told her, listen, here's what |

| | | |
|---|---|---|
| 09:18:08 | 1 | happened. I have gone through a fire, I am having to rebuild, |
| 09:18:14 | 2 | I am in the process of rebuilding the home. I told her again |
| 09:18:18 | 3 | about five or six months after the fire. |
| 09:18:20 | 4 | Q. Was your wife living in California at that time? |
| 09:18:22 | 5 | A. We were living in California at the time in San Jose. |
| 09:18:26 | 6 | Q. When did you see the, I will call her, therapist, I |
| 09:18:38 | 7 | believe that's her proper title? When did you see the |
| 09:18:42 | 8 | therapist? When did you first see the therapist that you are |
| 09:18:48 | 9 | currently seeing? |
| 09:18:48 | 10 | A. I believe it was around January of 2011. |
| 09:18:56 | 11 | Q. Which I estimate, if my math serves me correctly, is about |
| 09:19:06 | 12 | four and a half years or so after the fire? |
| 09:19:10 | 13 | A. Yes. |
| 09:19:10 | 14 | Q. How did you -- how were you getting along in those four |
| 09:19:16 | 15 | and a half years by the time you first saw the current |
| 09:19:20 | 16 | therapist? |
| 09:19:22 | 17 | A. Well, as far as getting along, I mean, I was performing in |
| 09:19:30 | 18 | my job, but I wasn't really dealing with the emotions of the |
| 09:19:40 | 19 | fire, and it wasn't -- I don't feel it even is now something |
| 09:19:48 | 20 | that's resolved. There's something that -- I mean, again, |
| 09:19:58 | 21 | when I talk about an idea of a triggering event, there can be |
| 09:20:04 | 22 | anything that happens that is a reminder that just makes me |
| 09:20:06 | 23 | feel a certain way. |
| 09:20:08 | 24 | As an example, just if you go to the elevators |
| 09:20:10 | 25 | outside here, you see they have flames showing for fire right |

09:24:12   1    the way that I thought. So obviously, having experienced the

09:24:20   2    fire and having that, which it was obviously a bad thing,

09:24:26   3    there's this idea that maybe more bad things are going to

09:24:28   4    happen to you, and so she would challenge me and say, you

09:24:32   5    know, can you think about positive things, can you think about

09:24:36   6    good things that can happen to you, can you try to make

09:24:42   7    friends, can you involve yourself with other people. So she

09:24:48   8    would try to challenge my thinking patterns.

09:24:52   9    Q. What did you notice, if anything, about your personal life

09:24:58  10    and your interaction with other people and acquaintances

09:25:02  11    during the time after the fire?

09:25:06  12    A. I found myself becoming very withdrawn, very removed from

09:25:16  13    people, and I found myself being distanced from my family, and

09:25:26  14    I found that I didn't want to celebrate holidays, I didn't

09:25:32  15    want to be around people. I wanted to just stay alone.

09:25:34  16    Q. Has that changed?

09:25:38  17    A. Well, again, I am being challenged to try to be more

09:25:44  18    outgoing and try to interact with people. It's difficult

09:25:50  19    because one of the -- one of the things that was really -- one

09:25:56  20    of the things that really happened was that going through this

09:26:00  21    experience, I really became very shortsighted about looking

09:26:06  22    towards the future. I didn't really feel like I could look to

09:26:10  23    the future because I felt at any moment that something could

09:26:16  24    happen and I wouldn't live through it. I mean, even something

09:26:20  25    as simple as that night when I went to sleep, to wake up, if I

10:10:16　1　way that this divorce is somehow connected to your experience

10:10:18　2　in the fire, correct?

10:10:20　3　A.　It's a part of life.　I am not saying that the fire is the

10:10:26　4　cause of the divorce.　I am sure it's related in some way.　I

10:10:28　5　mean, obviously I had communication issues where I didn't talk

10:10:34　6　to my wife about the fact that I had gone through this type of

10:10:36　7　an experience, so I am sure that that wasn't something that --

10:10:42　8　I am not going to say today that I am going to attribute the

10:10:46　9　fire as being the cause of the dissolution of marriage.

10:10:48　10　Q.　Mr. Plyler, you do remember in your deposition I asked you

10:10:54　11　questions associated with your divorce and you didn't want to

10:10:56　12　answer them and made it very plain to me that you were not

10:10:58　13　contending that divorce had anything to do with your

10:11:00　14　experience in the fire; do you remember telling me that?

10:11:04　15　　　　MR. SKALETSKY:　Your Honor, I believe -- I am going

10:11:08　16　to object to that question.　I believe Mr. Plyler already

10:11:10　17　stated that he is not linking the two, the fire and divorce.

10:11:16　18　　　　MR. HOSTETTER:　Your Honor, he just said he could not

10:11:18　19　link the two, and I want to make sure --

10:11:18　20　　　　THE COURT:　You may proceed.　Objection overruled.

10:11:42　21　　(Record read.)

10:11:44　22　　　　THE WITNESS:　I remember the deposition, I remember

10:11:44　23　questions about the divorce, I remember being directly asked

10:11:48　24　about whether or not I thought that the fire had caused the

10:11:52　25　divorce.　My response at the time of the deposition was that I

## CERTIFICATE OF SERVICE

I hereby certify that on May 11, 2012, a copy of the foregoing **DEFENDANT'S BRIEF IN OPPOSITION TO PLAINTIFF'S MOTION FOR NEW TRIAL** was filed electronically. Notice of this filing will be sent to the following attorneys by operation of the Court's electronic filing system, and, to those parties not receiving such notice, by U.S. Mail from One Wacker Drive, Chicago, Illinois. Parties may access this filing through the Court's system.

Scott Skaletsky, Esq.
Skaletsky & Associates, Ltd.
180 North Wacker Drive, Suite 203
Chicago, IL 60606

/s/ James E. Michel
James E. Michel

334135v.1