**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| ALLEN PLYLER, )<br>)<br>    Plaintiff, )<br>)<br>  v. )<br>)<br>WHIRLPOOL CORPORATION, )<br>)<br>    Defendant. ) | Case No. 08 C 6637<br><br>Magistrate Judge Geraldine Soat Brown |

**MEMORANDUM OPINION AND ORDER**

Before the court is plaintiff Allen Plyler's motion for a new trial. [Dkt 157.] For the reasons below, Plyler's motion is denied.

**BACKGROUND**

Allen Plyler filed this suit against defendant Whirlpool Corporation ("Whirlpool"), alleging counts of negligence and strict products liability. (Am. Compl.) [Dkt 25.] Plyer alleged that his Whirlpool microwave oven contained a design defect that caused the microwave to start a fire in his kitchen, which spread to other parts of the home while he was inside. (*Id.*, Cnts. 1 & 2.) The specific defect at issue was the lack of a proper sealant of the microwave's waveguide cover. (Jury Instr. at 20 [dkt151].) Plyler claimed that Whirlpool was negligent in failing to notify him it had recalled the microwave due to this defect. (*Id.*, Cnt. 1.) Plyler further claimed that Whirlpool was strictly liable because it knew or should have known the microwave was defective and failed to adopt

1

an alternative design, leaving the microwave not reasonably safe. (*Id.*, Cnt. 2.) As a result, Plyler claimed he suffered physical and emotional injuries from his experience with the fire. (*Id.*, Ct. 1 ¶¶ 11-14; Ct. 2, ¶¶ 16-18.)

The case was tried before a jury on March 12-14, 2012, and on March 15, 2012, the jury returned a verdict for Whirlpool and against Plyler on both counts. [Dkt 155, 156.] Plyler timely filed this motion on April 12, 2012. *See* Fed. R. Civ. P. 59(b).

**DISCUSSION**

A court may grant a new trial pursuant to Federal Rule of Civil Procedure 59(a) when "the verdict is against the weight of the evidence, the damages are excessive, or if for other reasons the trial was not fair to the moving party." *Frizzell v. Szabo*, 647 F.3d 698, 702 (7th Cir. 2011) (internal quotations and citations omitted). Plyler makes three arguments why the court should grant a new trial: (1) the verdict was against the manifest weight of the evidence; (2) the court improperly restricted Plyler from offering his own personal opinions under Federal Rule of Evidence 701; and (3) Plyler should not have been cross-examined about the effect of his divorce on his mental health. (Pl.'s Mot. at 1.) These arguments are addressed in turn.

I. **The jury's verdict was not against the manifest weight of the evidence.**

A jury verdict will be set aside as contrary to the manifest weight of the evidence only if no rational jury could have rendered it. *Moore ex rel. Estate of Grady v. Tuleja*, 546 F.3d 423, 427 (7th Cir. 2008). If the record shows the jury's verdict resulted in a miscarriage of justice or if the verdict "cries out to be overturned or shocks [the] conscience," a new trial may be properly granted. *Galvan*

*v. Norberg*, 678 F.3d 581 (7th Cir. 2012) (quoting *Latino v. Kaizer*, 58 F.3d 310, 315 (7th Cir. 1995)). In deciding whether to grant a new trial, the court "has the power to get a general sense of the weight of the evidence, assessing the credibility of the witnesses and the comparative strength of the facts put forth at trial." *Mejia v. Cook County, Illinois*, 650 F.3d 631, 633 (7th Cir. 2011). But the court gives deference to the jury's verdict, particularly in cases with "simple issues but highly disputed facts." *Moore*, 546 F.3d at 427; *accord Mejia*, 650 F.3d at 631 n. 1.

Plyler argues that the verdict was against the manifest weight of the evidence for three reasons: (1) Plyler's testimony demonstrated that there was a "sufficient factual basis" for finding that Whirlpool should have advised him of its recall of the microwave; (2) the evidence showed that the origin and source of the fire was the microwave; and (3) the evidence showed that Plyler kept the microwave clean and "avoided flammable condition." (Pl.'s Mot. at 2-4.)

### A. Notice of the recall

On his negligence claim, Plyler had the burden to establish the existence of a duty of care owed to him by Whirlpool, a breach of that duty, and an injury proximately caused by that breach. *Thompson v. Gordon*, 948 N.E.2d 39, 45 (Ill. 2011). Plyler cites his own cross-examination testimony as evidence "sufficient" to establish that Whirlpool breached a duty to notify him about its recall of the subject microwave. (Pl.'s Mot. at 2-3.) Although Plyler admitted that he did not recall filling out and returning the warranty registration card for the microwave, he opined that Whirlpool could have obtained sales and credit card records from Best Buy (where he bought the microwave) as a means of gathering purchaser information and identifying whom to notify about the

3

recall. (Tr., Testimony of Allen Plyler Mar. 13, 2012 at 39-40, 70-73.)[1] Had Whirlpool done so, Plyler believes it would have gotten his contact information and been able to notify him. (*Id.*)

Plyler's motion does not consider the testimony of Larry Lateck, the director of global product safety at Whirlpool. (*See* Def.'s Resp., Ex. A, Testimony of Larry Latack at 3 [dkt 163], Def.'s Supp., Ex. B, Latack Test. at 25-27 [dkt 165].)[2] Mr. Lateck testified that Whirlpool voluntarily went to the Consumer Product Safety Commission ("CPSC") with reports of several incidents involving the microwave model, and instituted a process to recall the affected microwaves. (*Id.*) That process included looking through Whirlpool's own records of registration and service and requesting information from its trade partners in order to send notices to purchasers. Whirlpool also put out news releases and contacted news media, took out two iterations of ads in national media such as *Parade Magazine* and put point-of-purchase posters in stores. He testified that the CPSC requires reports on recalls including the number of products reworked, and that, with respect to this microwave model, 75% of the products were reworked. That is much better than the average result of a recall, which, he testified, is 10%-15%. The CPSC closed its file on this recall in 2003. Plyler presented no evidence contradicting or rebutting Mr. Latack's testimony.

Plyler's argument does not demonstrate that the verdict in favor of Whirlpool was against the manifest weight of the evidence. Plyler's speculative testimony that Whirlpool might have done more in its recall process does not establish that what Whirlpool did was negligent, let alone that no

---

[1] Plyler submitted to the court transcript excerpts of his testimony on March 12 and 13, 2012, but has not yet filed them on the docket. This opinion is based on the transcripts, the court's notes and the court's audio recording of the trial.

[2] Whirlpool submitted to the court transcript excerpts of the testimony of Larry Latack but did not file his entire testimony on the docket.

4

reasonable jury could have found against Plyler. Moreover, the jury's verdict on the negligence count could also have resulted from a finding that Plyler failed to establish the causation element of his negligence claim. As discussed further below, Plyler offered nothing outside his own speculation to connect the alleged defect in the microwave to the start of the fire.

### B.     The origin of the fire

Plyler's second argument – that his own testimony demonstrated that the fire originated in the microwave – goes to the causation element in both his negligence and strict liability claims. Plyler testified that he observed a fire inside the microwave in "three different locations" through a grill above the door on the front of the microwave, which turned into larger flames despite his attempts to extinguish it. (Tr., Plyler Mar. 12, 2012 at 12, 17-18.) Plyler also introduced photographs of the microwave taken after the fire depicting debris and char marks on the top of the microwave. (Tr., Plyler Mar. 13, 2012 at 10-11.) However, Clifford Mortenson, a fire investigator for the Wheaton Fire Department testified that the Fire Department's official report of the fire described the cause as "undetermined," which was also Mr. Mortenson's own conclusion.

Whether Plyler established that the origin of the fire was the microwave was a question for the jury. It was the province of the jury to evaluate Plyler's and Mr. Mortenson's testimony, as well as the photographs and the report of the Wheaton Fire Department, which were admitted into evidence. The jury was not unreasonable in returning a verdict for Whirlpool in light of the evidence presented.

5

### C. The clean condition of the microwave

Plyler's third argument is that the evidence showed he kept the microwave clean and avoided a "potential flammable condition," because Plyler testified he "cleaned it quite often" and "[i]t was not typical for the microwave on the interior to be dirty." (Pl.'s Mot. at 4-5; Tr., Plyler Mar. 13, 2012 at 9-10.)

Plyler does not explain how the jury's verdict was irrational in light of this evidence. On the contrary, Plyers's testimony about how clean he kept the microwave was inconsistent with his claim that the cause of the fire was the lack of a proper sealant of the waveguide cover. Mr. Latack was the only witness who testified about the nature of the alleged defect. He testified that the insufficient sealant on the waveguide cover could only cause a fire if the microwave was left *unclean* and there was a heavy buildup of contaminants. (Latack Test. at 25-26.)

Mr. Latack explained that the waveguide is a metal tube. When the microwave is operating, radiation energy travels from the magnatron to the food cavity through the waveguide. As initially designed, the material on the waveguide cover was mica. In a situation of heavy food contamination and splatter, food material might penetrate the relatively porous mica cover and get into the waveguide. The radiation energy could turn the food materials to smoke and then to plasma, which could heat surrounding elements. In certain conditions, that heat could be sufficient to cause a fire. Mr. Latack further testified that this sequence could only occur when the microwave was operating in order to generate the energy necessary to turn the contaminate to smoke and ultimately to plasma. The ultimate failure (fire) was rare; Whirlpool knew of seven incidents at the time of the recall. As part of the recall process, the waveguides were sealed with polyester.

Plyler introduced no evidence about the nature of the microwave defect and its relation to the

6

cleanliness of the microwave other than the testimony of Mr. Latack. A rational jury could accept Mr. Latack's testimony that the defective sealant could only cause a fire if there was heavy food build-up and contamination in the microwave, and if the microwave was in operation. If they did so find, then Plyler's testimony that he kept it clean would only have weakened his case. Moreover, Plyler also testified that "to [his] knowledge," it was not possible that the microwave was on shortly before the fire. (Tr. Plyler Mar. 13, 2012 at 9.)

Plyer's arguments do not demonstrate that the jury's verdict was contrary to the manifest weight of the evidence.

## II. Plyler was not improperly precluded from presenting evidence.

A new trial may be ordered on the basis of an evidentiary error "if the error has a substantial and injurious effect or influence on the determination of a jury." *CERAbio LLC v. Wright Med. Tech., Inc.*, 410 F.3d 981, 994 (7th Cir. 2005). Plyer complains of two evidentiary rulings.

First, during his direct examination, Plyler offered the following testimony:

Q: Once the emergency personnel got to your home with all of their equipment, what did they do with respect to your house?

A: Well, you know, they – I guess they did their job. They prepared to analyze the best way to attack the fire. It seemed to take a long time for them to get in the position. And then they went into the home and began poking holes into walls and trying to discover where the fire was.

And they also got up on the roof and were poking holes into the roof to identify where the fire was. And then they put water hoses down from the roof and were spraying down into the attic and in between the walls to put the fire out.

Q: Did they eventually locate the source of the fire?

(Tr. Plyler Mar. 12, 2012 at 23-24). At that point, Whirlpool objected on the basis that the question

7

was "calling for opinion testimony that this witness isn't capable of doing. If we're going to hear it, at least come from the fire [de]partment." (*Id.*) The court sustained this objection. Plyler complains that the question did not ask for expert testimony but only what Plyler perceived.

Whirlpool's objection had two parts: objecting to opinion testimony and objecting to hearsay. The court sustained the hearsay objection. The question asked Plyler to recite something that he learned from the fire investigators, as Plyler acknowledges. (Pl.'s Mot. at 7.) His testimony about whether *the firefighters* located the source of the fire – whether Plyler learned it from them directly or he read it from their report – would be hearsay. Fed. R. Evid. 802. In any event, the jury later heard from Mr. Mortenson directly about the Fire Department investigation, and the investigation report was admitted into evidence. If the failure to allow Plyler to testify about what the investigators learned about the source of the fire was error, it was harmless.

Second, Plyler complains that he was barred from "offering opinions in light of Federal Rule of Evidence 701." (Pl.'s Mot. at 6.)[3] A problem with Plyler's motion is that he does not identify

---

[3] Federal Rule of Evidence 701 states as follows:

If a witness is not testifying as an expert, testimony in the form of an opinion is limited to one that is:

   **(a)** rationally based on the witness's perception;
   **(b)** helpful to clearly understanding the witness's testimony or to determining a fact in issue; and
   **(c)** not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.

Federal Rule of Evidence 702, in contrast, states:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

   **(a)** the expert's scientific, technical, or other specialized knowledge will help

8

precisely what opinions he claims he was improperly precluded from giving. Nor did Plyler make an offer of proof made at trial as to any testimony he would have given if not precluded.

Plyler's motion does discuss the court's instruction that Plyler confine his testimony to what he observed rather than his interpretation of what he observed. (Pl.'s Mot. at 8-9.) That occurred in the following context. On the first day of his testimony, Plyler testified about photographs from the fire scene taken after the fire. He told the jury, "What you're seeing from this boarded-up area is, that's the acceleration of the fire before they were able to begin to put the fire out. So obviously the fire was spreading quite rapidly at that time, prior to the fire department arriving and being able to put it out." (Tr. Plyler Mar. 12, 2012 at 34.) That testimony went in without objection. Subsequently, after the jury had been dismissed for the day, Whirlpool's counsel raised a concern that Plyler's testimony was "getting close to . . . being a fire expert, talking about accelerant and describing the fire. I have no problem having him describe what he saw. But he's getting awfully close to venturing and giving expert testimony . . . ." (*Id.* at 36.) The court (out of the presence of the jury) cautioned Plyler: "you are not an expert on the area of fire causes, or you haven't been tendered as such. So I would just instruct counsel to keep the questions factual . . . and not speculative or venturing into opinion testimony." (*Id.*)

The next day, Plyler offered further testimony describing photographs of the post-fire microwave:

---

the trier of fact to understand the evidence or to determine a fact in issue;
**(b)** the testimony is based on sufficient facts or data;
**(c)** the testimony is the product of reliable principles and methods; and
**(d)** the expert has reliably applied the principles and methods to the facts of the case.

9

> A: Again, this is the microwave, and on the top part, there's obviously paint that has been discolored and it has obviously been subject to extreme heat. You can see the black, which shows charring from fire.
>
> . . .
>
> A: So the – this looks like a top view, in other words, a picture taken from the top of the microwave . . . . So, again, looking at the back area that's kind of open, that looks like the area that it would have exhausted from. And then what you see directly on top with all the wires there is that's the actual burned power cord. So the area that you see which is not burned which is – and I have to give an approximation of this, but the approximation of this is probably about 8, 12 inches.

(Tr. Plyler Mar. 13, 2012 at 12, 15.)

At that point, Whirlpool objected in a side bar that Plyler "is getting beyond what is actual fact testimony." (*Id.* at 16.) Out of the presence of the jury, Whirlpool's counsel moved to strike the last statement, as well as for an instruction to Plyler to testify to what he saw and not his interpretation. The court did *not* strike Plyler's testimony, but the court asked Plyler's counsel: "[W]ould you object if I instructed him to confine his testimony to what he observed rather than interpretations?" (*Id.* at 17.) Plyler's counsel replied that he had no objection, and the court so instructed Plyler. (*Id.*) Following that instruction, Plyler continued to testify about what he saw in the photographs, including testifying about the extent and direction of the fire. (*See id.* at 18-19.)

Plyler now argues that as a result of that instruction, Plyler was "handcuffed as to the nature of the testimony that he was permitted to communicate to the jury" and his "counsel could not elicit from Plyler any information about the fire other than what was actually located in front of Plyler . . . ." (Pl.'s Mot. at 9-10.) But all he actually complains of is "not being allowed to testify about his own perception of the extent of the fire and the area that he saw burned." (*Id.* at 10.) In fact, he gave extensive testimony about his perceptions of the fire, and as the testimony quoted above demonstrates, he also testified about what he saw in the photographs taken after the fire, including

10

the extent and direction of the fire. (*See* Tr. Plyler Mar. 13, 2012 at 19.)

Plyler does not claim to have the qualifications necessary to testify under Rule 702. Rather, he argues that he was somehow precluded from giving testimony that was within the allowable limits of lay opinion testimony under Rule 701 – although he does not specify exactly what that testimony would have been. Lay opinion "most often takes the form of a summary of firsthand sensory observations" and may not "provide specialized explanations or interpretations that an untrained layman could not make if perceiving the same acts or events." *Tribble v. Evangelides*, 670 F.3d 753, 758 (7th Cir. 2012) (*quoting U.S. v. Conn*, 297 F.3d 548, 554 (7th Cir. 2002)). Rule 701 was amended "to emphasize that lay opinion testimony is limited to those observations of a lay witness that are not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." *Compania Administradora de Recuperacion de Activos Administradora de Fondos de Inversion Sociedad Anonima v. Titan Intl., Inc.,* 533 F.3d 555, 561 (7th Cir. 2008) (*quoting U.S. v. Conn*, 297 F.3d at 554 (quoting Fed. R. Evid. 701)). The amendment was designed to prevent parties from "proffering an expert in lay witness clothing." Fed. R. Evid. 701 advisory comm. n. (2000).

There is nothing in this record to demonstrate that the court precluded Plyler from rendering a proper lay opinion that he sought to give under Rule 701, and Plyler's motion does not identify any such opinion. This is not a sufficient basis upon which to order a new trial.

**III.    Evidence regarding Plyler's divorce was properly admitted.**

Plyler's final argument is that the court erred in allowing Whirlpool to cross-examine him about his divorce. (Pl.'s Mot. at 10-11.) Plyler argues that because "at no time was he connecting his feelings arising out of his divorce with the way in which the fire caused him emotional trauma,"

11

it was improper for Whirlpool's counsel to ask questions "inferring" that the divorce, and not the fire, was the cause of Plyler's emotional damages. (*Id.* at 11.)

A major element of Plyler's claimed damage was emotional distress allegedly caused by the fire. To support that claim, Plyler called as a witness (by deposition) Rhonda Campbell, the marriage and family therapist he had seen beginning in January 2011 (four and a half years after the fire), who diagnosed him with Post Traumatic Stress Disorder. Among the other stressors in Plyler's life, Ms. Campbell testified, was the fact that his marriage had ended badly.

During his direct examination, Plyler introduced testimony that he was married at the time of the fire but later divorced. (Tr., Plyler Mar. 13, 2012 at 21, 25-26.) In cross-examination of Plyler, Whirlpool's counsel asked a line of questions about when exactly the divorce occurred, how it affected him, and whether he "was claiming in any way that this divorce is somehow connected to [his] experience in the fire." (Tr., Plyler Mar. 13, 2012 at 61-62.) To the last question, Plyler responded that "I am not saying that the fire is the cause of the divorce. I am sure it's related in some way. I mean, obviously I had communication issues where I didn't talk to my wife about the fact that I had gone through this type of an experience . . . ." (*Id.*) Whirlpool then asked Plyler whether, in his pre-trial deposition testimony, he had "made it very plain . . . that you were not contending that divorce had anything to do with your experience in the fire . . . ?" (*Id.*) At that point, Plyler's counsel objected on the grounds that "Mr. Plyler already stated that he is not linking the two, the fire and divorce." (*Id.*)

Whirlpool was entitled to introduce any relevant evidence at trial. Evidence is relevant if it has "any tendency to make a fact more or less probable than it would be without the evidence" and "the fact is of consequence in determining the action." Fed. R. Evid. 401. The court may exclude

relevant evidence if its probative value is substantially outweighed by a danger of unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence. Fed. R. Evid. 403.

Whirlpool's counsel's limited questioning about Plyler's divorce was admissible on two grounds. First, the testimony that Whirlpool attempted to elicit about Plyler's divorce was relevant because it had a "tendency to make a fact more or less probable" – namely, that the divorce was a possible contributing cause to Plyler's mental and emotional state. Plyler alleged substantial emotional damages as a result of the house fire, and Whirlpool was entitled to explore possible alternate causes of those alleged damages. Moreover, Plyler himself introduced evidence of his divorce both in his direct examination and in the testimony of his witness, Ms. Campbell. Second, in light of Plyler's statement that "I am sure it's related in some way," Whirlpool's counsel was entitled to clarify that Plyler was not asserting that the fire caused or contributed to his divorce. Whirlpool's counsel's questioning was limited, straightforward and factual. It was not argumentative or hostile. There is nothing in the record to suggest that it unduly prejudiced the jury in any way. That evidence was properly admitted and does not provide any basis on which to order a new trial.

## CONCLUSION

For the foregoing reasons, Plyler's motion for a new trial is denied.

**IT IS SO ORDERED**.

_____
**Geraldine Soat Brown
United States Magistrate Judge**

**Dated: July 3, 2012**